UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **DIAMOND SERVICES CORPORATION** | **CIVIL ACTION NO:** |
| **VERSUS** | **DISTRICT JUDGE HON.** |
| **NEPTUNE AMERICAS & MARINE CORPORATION** | **MAGISTRATE JUDGE HON.** |

## COMPLAINT

### I.  Parties, venue, and jurisdiction

1.

Plaintiff, Diamond Services Corporation, is a corporation headquartered in Amelia, Louisiana.

2.

Defendant Neptune Americas & Marine Corporation is a corporation headquartered in Houston, Texas, with its principal place of business in Houston, Texas.

3.

This Court has subject matter jurisdiction under 28 U.S.C. 1332 because the parties are fully diverse and the amount in controversy is in excess of $75,000.

4.

This Court further has subject matter jurisdiction under 28 U.S.C. 1333 because the subject matter of the dispute is the breach of a contract for the design of a dredge, which is a maritime contract.

5.

This Court has personal jurisdiction over Neptune because Neptune is headquartered in Houston, and because the contract giving rise to this suit calls for jurisdiction in Houston.

6.

Venue is appropriate in this judicial district because Neptune is headquartered in this judicial district and because Neptune's work for Diamond, and breach of contract with Diamond, occurred in this judicial district.

## II.     Neptune contracts with Diamond to provide Diamond with the plans and equipment to build a dredge.

7.

On or about July 21, 2022 Diamond Services Corporation contracted with Neptune for the supply of the design, engineering, and equipment for a Cutter Suction Dredge, the GATOR 50.

8.

Neptune told Diamond, in the contracting documents, that Neptune had 50 years of experience as a specialized provider of marine solutions.

9.

In the contract, Neptune agreed to provide Diamond with the following:

a.  One license to produce a Neptune cutter suction design – Gator 50;

b.  Parts and services according to a separate technical specification sheet;

c.  Anchor booms;

d.  A full time project manager and project engineer;

e.  Neptune supervision online on critical assemblies;

  f. Four weeks of assistance for commission and sea trials;

  g. Two weeks technical support;

  h. Dredging depth extension;

  i. VHF radio;

  j. Air conditioning;

  k. Spare parts and equipment

10.

Separately, Neptune told Diamond that the GATOR 50 dredge would be approved by Bureau Veritas. Bureau Veritas is a class society that classes dredges.

11.

Neptune contracted with Diamond to provide a production drawing (i.e. a useable plan for the dredge that Diamond could begin to construct) by November of 2022, and final BV design approval too by November of 2022.

12.

Neptune contracted with Diamond that Neptune would begin procuring significant long-lead items in June and July of 2022.

13.

Neptune further contracted with Diamond that Neptune would finish procurement by January of 2023; finish fabrication by March of 2023; finish assembly by June of 2023; finish tests by July of 2023; and final delivery would occur by July of 2023.

14.

In addition, Neptune provided Diamond with, and incorporated into its contract with Diamond, a functional specification, outlining the details of the dredge with specificity.

However, this functional specification was not a plan and not something that enabled Diamond to begin construction. That would require Neptune to provide Diamond with actual plans, approved by BV.

15.

Neptune too included and incorporated a demarcation proposal that laid out which responsibilities were Neptune's, and which were Diamond's. Significantly, all the engineering responsibility was Neptune's. Standards, units, margins, standardization, and class approval were 100% the responsibility of Neptune.

16.

Neptune included a general arrangement, which is a layout of the dredge, but a GA does not constitute plans that Diamond could use to build. Significantly, all the measurements in the GA were in imperial units, because, as both Neptune and Diamond knew (and as Neptune promised in providing spare parts, and as the parties repeatedly discussed), parts for building American vessels are always in standardized imperial units. Neptune contracted with Diamond to provide a dredge that is "available in standard design that are easily customizable."

17.

For its part, Diamond had certain payment obligations: 15% on signing; 20% to procure long-lead items (identified as the pump, gearbox, engine, and cabin); and 65% based on physical progress according to a project schedule.

18.

Neptune also included general terms and conditions of sale, which conditions call for venue and jurisdiction in the state and federal courts of Texas, along with additional terms discussed *infra*.

### III. Neptune falls behind repeatedly.

19.

Neptune had contracted with Diamond to provide BV-stamped drawings for the dredge by November of 2022. Only in September of 2023 has Neptune provided Diamond with BV-classed drawings, though Neptune has been paid in full for those drawings for some time.

20.

On December 15, 2022, Neptune represented to Diamond in writing that the dredge drawings are already approved by BV. Separately, on December 19, 2022, Neptune provided Diamond with a status report that within ten days, Neptune would have completed "basic design and BV approval," and detailed engineering drawings – the drawings that Diamond could use to begin construction – on January 6, 2023.

21.

Unknown to Diamond, and intentionally concealed by Neptune, Neptune did not have BV approval for its dredge drawings.

22.

On December 19, 2022, Neptune provided to Diamond a nesting model. Nesting models are instructions to a metal cutter on how to cut out steel from sheets to form the dredge, similar to a pattern for how to cut pieces of clothing (a dress, say) from a sheet of fabric. Significantly, nesting drawings come in a series of numbers – instructions to a computer – not in the form of actual drawings. The nesting drawings are uploaded to the metal cutter's computer to cut.

23.

Neptune represented to Diamond in writing that these were the final nesting drawings.

24.

With these nesting drawings, Diamond began obtaining coupons (sample of metal plate) and obtaining plate for the metal cutter to cut. Diamond repeatedly confirmed with Neptune in writing that the nesting drawings were final, and Neptune confirmed to Diamond that they were final.

25.

With the metal obtained and approved, on May 16, 2023, Diamond informed Neptune that Diamond was prepared to begin cutting steel plates for the dredge, and Neptune confirmed that Diamond should begin cutting.

26.

In May of 2023 and again in July of 2023, Neptune sent Diamond "additional documents." Neptune had actual knowledge that these were new nesting models, and that the nesting models it had sent to Diamond prior (a) were not workable; and (b) were not and would not be BV-approved.

27.

Despite that actual knowledge, Neptune did not tell Diamond not to do anything further with the wrong nesting model that Neptune had sent Diamond prior, and in fact Neptune did not tell Diamond at all that Neptune's new nesting model was a new nesting model, replacing the old nesting model.

28.

Neptune's new nesting model was already nearly than a year behind schedule, in material breach of its contract with Diamond.

29.

Diamond began to realize that the plate Diamond had caused to have cut, pursuant to Neptune's nesting files, did not match the drawings provided, and began inquiring. It was not until September 11, 2023 that Neptune admitted to Diamond that its nesting models were wrong, telling Diamond "[i]t appears that the previous nesting utilized the incorrect file from February instead of the updated ones we sent in May 2023. Additionally, it seems that the entire pontoon was overlooked in the process." This was, under the contract, entirely Neptune's responsibility.

30.

Additionally, for further items for the dredge, Neptune provided Diamond with drawings over the summer of 2023 that were merely a conversion of items from metric to imperial.

31.

The conversion from metric to imperial is not a problem, per se, if done well. It became a problem because Neptune did not, despite its contractual obligation to provide parts in standard, replaceable, off-the-shelf measurements, do so. Instead, Neptune merely converted the metric measurements to imperial measurements (e.g. multiplying centimeters by 2.54 to arrive at inches) without acknowledging that there are no standard, imperial parts in random fractions of an inch.

32.

Neptune's provision of pieces and parts with a simple conversion from metric to imperial was a breach of Neptune's obligation to provide Diamond with a modular dredge, with off-the-shelf parts.

33.

Neptune had actual knowledge, both before and after it contracted with Diamond, that it did not have good and merchantable drawings that would timely be approved by BV and could be used to build a dredge, but despite that, Neptune fraudulently represented the contrary to Diamond. Neptune further fraudulently represented to Diamond that it would and could have BV-approved drawings to Diamond in the times represented in the contract.

34.

As of August 7, 2023, approximately one year after Neptune had contractually agreed to provide Diamond with functioning drawings, Neptune had not provided Diamond with drawings that would allow Diamond to build the dredge.

35.

Additionally, Neptune was obligated to procure certain long-lead items under the contract. Neptune was paid for those long-lead items. Neptune has failed to procure and provide those items to Diamond, and has failed to account for Diamond where Diamond's money has been spent.

36.

Additionally, Neptune has sought to charge Diamond additional funds, for responsibilities that are Neptune's under the relevant contract and covered by the contract price – seeking to charge Diamond for Neptune to remedy Neptune's mistakes. When Diamond has refused these invoices, Neptune has threatened to walk the job.

37.

As a result of Neptune's repeated breaches of its contract and its efforts to cover up its breaches, Diamond's source of funding for the dredge has pulled its funding for the dredge.

## IV.  Neptune's breach of contract, and tortious and fraudulent conduct

38.

Neptune's conduct as outlined *infra* is a breach of Neptune's contract with Diamond.

39.

Neptune breached its warranty to Diamond that its equipment would be free from defects in material and workmanship for the reasons *infra*.

40.

Neptune breached its warranty to Diamond that its services would be performed in a professional and workmanlike manner for the reasons *infra*.

41.

Neptune, by representing to Diamond that it had approval from BV for the drawings, when it did not, made willful and intentional misrepresentations to Diamond.

42.

Neptune, by providing Diamond with the wrong nesting model and telling Diamond that Neptune's nesting model was final when in fact it was inaccurate, then seeking to cover up that fact by not telling Diamond that it was substituting a new nesting model, made willful and intentional misrepresentations to Diamond.

43.

Neptune, by telling Diamond that it would and could have drawings for Diamond that would be actionable, allowing Diamond to build the dredge, when in fact it neither did nor could provide those drawings timely and Neptune had actual knowledge that, contrary to its representations, it did not have actionable drawings.

44.

Neptune, on information and belief, intentionally spent Diamond's money that was directed toward the purchase of long-lead items elsewhere, in breach of the contract.

45.

Diamond has repeatedly explained in writing to Neptune that Neptune's services and goods are inadequate, and Neptune has refused to remedy its conduct.

46.

Neptune's conduct as described *infra* rises to the level of gross negligence in Texas law and under the general maritime law.

47.

Neptune's conduct described *infra* constitutes fraud in the inducement and fraud post-contracting, either of which entitles Diamond to tort damages.

48.

Diamond is entitled to the following damages:

a. All amounts Diamond has paid to Neptune;

b. Diamond's loss of charter hire for the dredge;

c. Diamond's direct damages, including its outlay for parts, equipment, labor, and lost charter hire;

d. Diamond's consequential damages;

e. Punitive damages;

f. Attorney's fees;

g. Other damages to be proven at trial.

WHEREFORE Diamond prays that there be judgment entered in its favor and against Neptune, awarding Diamond damages, fees, costs, interest, and whatever other just or equitable remedies this Court find proper.

DATED: November 30, 2023

                                          Respectfully submitted:

BOHMAN | MORSE, LLC

/s/Harry E. Morse
HARRY E. MORSE (#31515)
MARTIN S. BOHMAN (#22005)
400 POYDRAS STREET, SUITE 2050
NEW ORLEANS, LA 70130
TELEPHONE: (504) 930-4009
FAX: (888) 217-2744
E-MAIL: HARRY@BOHMANMORSE.COM
E-MAIL: MARTIN@BOHMANMORSE.COM
*Attorneys for Diamond Services Corp*